IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-02550-WYD-KMT

KRISTINA HILL,
BRIAN EDWARDS, and
THOMAS PRIVITERE,

      Plaintiffs,

v.

PUBLIC ADVOCATE OF THE UNITED STATES,
NATIONAL ASSOCIATION OF GUN RIGHTS,
ROCKY MOUNTAIN GUN OWNERS,
LUCIUS O'DELL,
ANDREW BROWN, and
DUDLEY BROWN,

      Defendants.

---

**MEMORANDUM IN SUPPORT OF PUBLIC ADVOCATE OF THE UNITED STATES'
MOTION FOR SUMMARY JUDGMENT**

---

Defendant Public Advocate of the United States ("Public Advocate"), by and through

undersigned counsel, submits the following memorandum in support of its motion for summary

judgment.

CERTIFICATION:   Plaintiffs' counsel has stated to Public Advocate's counsel that

plaintiffs oppose this motion.

## I.   MOVANT'S STATEMENT OF MATERIAL FACTS

**A.    Incorporation of NAGR Statement of Facts**

Public Advocate incorporates the statement of material facts set forth in the November

14, 2013 Memorandum in Support of Summary Judgment filed by National Association for Gun Rights, *et al*. (the "NAGR Memorandum").

**B.     Additional Facts**

1.      Eugene Delgaudio is the president of Public Advocate.   Delgaudio, 15-5-6. [1]

2.      Public Advocate is a pro-family advocacy group that seeks to preserve the traditional family.   Delgaudio, 34:21-35:1; 42:21-43:1.

3.      Public Advocate supports public policies at the federal, state and local level that promote the traditional "man-woman" definition of marriage.   Delgaudio, 44:15-17.   Since 1981 Public Advocate has been "strident," "upfront," "loud" and "aggressive" in the advocacy of its public policy positions.   Delgaudio, 42:21

4.      Public Advocate advocates against homosexual marriage and civil unions. Delgaudio, 42:21; 46:20.

5.      In the 2012 legislative session Colorado State Senator Jean White of Colorado's 8th Senate District supported a bill that would have granted same-sex couples the right to enter into civil unions.   First Amended Complaint ("Complaint"), ¶ 10.

6.      In 2012 Senator White was engaged in a primary against another Republican for her Senate seat.   Complaint ¶ 10.

7.      In 2012 Jeffrey Hare was a Republican candidate for Colorado House District 48. Complaint ¶ 14.

8.      The civil unions vote in the Colorado legislature in 2012 was very close. Delgaudio 61:11-62:9.

---

[1] Deposition transcripts will be cited by page and line number as follows:   "Witness, page:lines"

9.      On April 24, 2012 Dudley Brown asked Mike Rothfeld whether he believed

Public Advocate would be interested in sending out mail in political races in which civil unions

was a big issue; Mr. Rothfeld indicated that he believed Public Advocate would become

involved, if someone else did most of the work.   Exhibit B to First Amended Complaint

("Complaint").

10.      On or about April 26, 2012 Mr. Brown and Mr. Delgaudio had a telephone

conversation in which they discussed Public Advocate sending mail into certain Colorado

districts.   Delgaudio 182:16-183:5; Brown, 38:19-41:21.

11.      On that same day, April 26, 2012, Mr. Brown sent out a memo in which he

outlined the proposed mailing program.   Exhibit C to Complaint; Brown, 40:14-20.   In this

email Mr. Brown proposed the following:

> What I propose is that [Public Advocate] pay for mailing in at least two races: one
> is House District 48 (detailed below), as well as Senate District 8 (memo
> forthcoming).   My staff and I would do all the work, but we'd want [Public
> Advocate] to sign off, put it's name on the dotted line, and pay for the mailings.

12.      Mr. Brown told Mr. Delgaudio that by sending this mail Public Advocate could

"make a splash to defeat pro-gay marriage Republicans."   Exhibit C to Complaint.

13.      On April 26, 2012 Mr. Delgaudio stated that he was willing to approve and fund

the effort proposed in Mr. Brown's memo.   Delgaudio, 182:16-19.

14.      Mr. Delgaudio approved the mailers on behalf of Public Advocate and made the

final decision to send them out.   Delgaudio, 62:7-8; 68:19-21.

15.      Spectrum Marketing Companies prepared the mailers to go out on or about May

22, 2012.   Exhibit A.   The total cost of the two mailings was $3,157.14.   *Id*.

16.     The Hare Mailer was sent to 4,625 Republican primary voters in Colorado House District 48.   Exhibit B; Delgaudio 230:6-231:5.

17.     The White Mailer was sent to 5,006 Republican primary voters in Colorado Senate District 8.   Exhibit B; Delgaudio 230:6-231:5.

18.     Senator White and Mr. Hare both lost their primaries.   Delgaudio, 242:17-19.

19.     The mailers were political advocacy pieces.   Exhibits C and D; Delgaudio 126:6-18; 128:15-19.   There was no fundraising solicitation in the mailers, because they were not intended as fundraisers, and in fact no funds were raised from the mailers.   *Id*.

20.     Mr. Delgaudio does not believe thegayweddingexperience.com blog is a strident political advocacy website.   Delgaudio, 266:9-15.

21.     Mr. Delgaudio does, however, believe that the gayweddingexperience.com website is a "soft" political advocacy website in that it advocates gay marriage generally. Delgaudio, 265:14-20; 268:5-13.

22.     Mr. Delgaudio testified:

It's still soft political, soft advocacy. This was clearly a site devoted to one side of the issue exclusively in words and in advocacy and statements and policies and wishes and designs and all-encompassing environment, the future, multitude of examples.   I would say it was probably the most generous wedding site of its kind available. I think that was what they were looking for. Now, gay wedding experience. They did a good job of presenting a multitude of photographs for that purpose, to convey, mainstream same sex weddings as the norm. And I don't think there is any similar website on the other side of it for traditional marriage. I don't think it exists.   This actually was a pretty good advocacy website -- for the blog. It's a blog. But it was a concept. And I understood the concept upon immediately seeing it.

Delgaudio, 275:1-19.

23.     Accordingly, Mr. Delgaudio believed it was OK to use the photograph in the

4

mailers.   Delgaudio, 277:7-20.

24.     Even though Mr. Delgaudio believed it was OK to use the photograph, *id*., as a

matter of personal preference he would have preferred to use a photograph that was taken from a

"hard political advocacy website."   Delgaudio, 272:10-17.

25.     Therefore, Mr. Delgaudio stated that had he known the photograph of Messrs.

Edwards and Privitere had come from a "soft" advocacy site, he would not have used it in the

mailers.   Delgaudio, 272:21-273:1.

26.     Mr. Delgaudio emphasized, however, that this was only a matter of his personal

preference:

> My understanding is advocacy is advocacy . . . So I felt kind of -- this is a
> political site.   Advocacy, soft advocacy, but it's not the hard standard that I
> would have wanted.

Delgaudio, 273:10-274:5.

## II. ARGUMENT

### A.     Legal Standard

Summary judgment is appropriate "'if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law.'"   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P.

56(c)).

### B.   Introduction

The facts in this case are not in dispute.   On April 26, 2012 Dudley Brown proposed that

Public Advocate send mail into the White and Hare primary races regarding the civil unions

issue.   Mr. Brown said that his staff would do all of the work, and all Public Advocate had to do was approve the mail and pay for printing and postage.   And that is what happened.   Brown's staff produced the mailers.   Mr. Delgaudio approved them, and the mailers went out on May 22, 2012, and Public Advocate paid for the printing and postage costs.[2]

Public Advocate is entitled to summary judgment because the material facts are not in dispute and it is entitled to judgment as a matter of law, because its use of the photograph in question was protected by the First Amendment and the fair use doctrine under copyright law.

**C.      Plaintiffs' Misappropriation of Likeness Claim Is Barred by the First Amendment.**

**1.   Elements of Claim**

Plaintiffs Edwards and Privitere claim Public Advocate unlawfully appropriated their likenesses and personalities.   Complaint ¶ 87.   In *Joe Dickerson & Assocs., LLC v. Dittmar*, 34 P.3d 995 (Colo. 2001), the Colorado Supreme Court set forth the following elements for this tort:

> (1) the defendant used the plaintiff's name or likeness; (2) the use of the plaintiff's name or likeness was for the defendant's own purposes or benefit, commercially or otherwise; (3) the plaintiff suffered damages; and (4) the defendant caused the damages incurred.   **A plaintiff's claim of invasion of privacy by appropriation of her name and likeness will not succeed, however, if the defendant's use of the plaintiff's name and likeness is privileged under the First Amendment.**

*Id.*, 34 P.3d at 997 (emphasis added).

As set forth in detail below, plaintiffs' claim fails on First Amendment privilege grounds.

**2.   Public Advocate's Use of the Mailers Was Privileged.**

Messrs. Edwards and Privitere have a particular view regarding the issue of same-sex unions.   They are in favor of them.   Indeed, they celebrate them, which is, of course, their right.

---

[2] Except for a minor amount, which was paid by RMGO.

No one would try to stop them if they wanted to exercise that right by climbing up on a rooftop and shouting for all of the world to hear that they believe same-sex unions are a wonderful thing, and, in a manner of speaking, they did just that.   Actually, they did much more than that.   When Edwards and Privitere posted the photograph set forth in paragraph 3 of the Complaint (the "Photograph) on the Internet in their "gayweddingexperience.com" website, they increased their potential audience from the dozens who might be in shouting distance from their rooftop to the hundreds of millions of people with access to the Internet.

Messrs. Edwards and Privitere intimate that they never sought to make a public statement when they posted the Photograph on the Internet.   For example, they try to color their publication of the image on the Internet by claiming the website was intended merely to share the wedding images with "friends and family."   Complaint ¶ 36.   Obviously, nothing could be further from the truth.   The Photograph was not posted in a private forum.   Messrs. Edwards and Privitere celebrated their same-sex union in a forum open to literally anyone on the planet with access to a computer.   Far from posting it in a private forum, they posted the Photograph in the most public forum ever known in the history of mankind, and it is disingenuous for them to suggest that they never intended to make a public statement.   They made a very public statement indeed concerning an issue about which they are passionate.

Moreover, there cannot be the slightest doubt that Messrs. Edwards and Privitere went far beyond mere sharing of private information about their personal experience.   They were advocating for same-sex unions.   The name of their website is not "ourweddingexperience.com."   It is "gayweddingexperience.com."   Thus, the very name of their website implies they are advocating for same-sex unions.   As Mr. Delgaudio testified,

while the website might not be hardcore, strident political advocacy, "[They] did a good job of presenting a multitude of photographs . . . to convey, mainstream same sex weddings as the norm. . . . This actually was a pretty good advocacy website." Delgaudio, 275:1-19

Public Advocate also has a particular view regarding the issue of same-sex unions. It deplores them. Ironically, while Messrs. Edwards and Privitere believe they should be able make a statement with literally a global reach in favor of same-sex unions, they believe Public Advocate should be punished for expressing its disagreement with them to 10,000 people in Colorado. Of course this is not the law. Just as Messrs. Edwards and Privitere have a First Amendment right to express their views about same-sex unions, Public Advocate has a First Amendment right to express its disagreement with the views they expressed.

This case is about one and only one thing: **the politics of same-sex unions**. Plaintiffs are in favor of them. Public Advocate opposes them, and it expressed its opposition to plaintiffs' position in these political mailers Indeed, plaintiffs affirmatively admit that the mailers were political speech. Plaintiffs' Responses to Requests for Admission, No. 2. Therefore, in their attempt to hold Public Advocate liable for its political speech, plaintiffs bear one of the heaviest burdens known to American law. *Buckley v. Valeo*, 424 U.S. 1, 14-15 (1976) ("it can hardly be doubted that the constitutional [free speech] guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.").

This case is governed by the free speech principles articulated by the Supreme Court in *Snyder v. Phelps*, __ U.S. __, 131 S.Ct. 1207 (2011), which concerned a demonstration that occurred at the funeral of Marine Lance Corporal Matthew Snyder. Defendants, members of Westboro Baptist Church, picketed outside Snyder's funeral, carrying signs that said things like

"Fag Troops," "Semper Fi Fags," "God Hates Fags," and "Fags Doom Nations."   Snyder's

father brought an action seeking to hold the church members liable for their demonstration.   The

Supreme Court rejected Snyder's claims, beginning its analysis by stating:

> "[S]peech on 'matters of public concern' . . . is 'at the heart of the First
> Amendment's protection.' *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
> 472 U.S. 749, 758-759, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985) (opinion of
> Powell, J.) (*quoting First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 776, 98 S.
> Ct. 1407, 55 L. Ed. 2d 707 (1978)). The First Amendment reflects 'a profound
> national commitment to the principle that debate on public issues should be
> uninhibited, robust, and wide-open.'   *New York Times Co. v. Sullivan*, 376 U.S.
> 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). That is because 'speech
> concerning public affairs is more than self-expression; it is the essence of self-
> government.'   *Garrison v. Louisiana*, 379 U.S. 64, 74-75, 85 S. Ct. 209, 13 L.
> Ed. 2d 125 (1964). Accordingly, '**speech on public issues occupies the highest
> rung of the hierarchy of First Amendment values, and is entitled to special
> protection**.' *Connick v. Myers*, 461 U.S. 138, 145, 103 S. Ct. 1684, 75 L. Ed. 2d
> 708 (1983) (internal quotation marks omitted).

*Id*., __ U.S. __, 131 S.Ct. at 1215 (emphasis added).

The court held that the Westboro Baptist Church members' speech was in fact on matters

of public concern and therefore completely protected by the First Amendment.   Of particular

importance with regard to plaintiffs' claims here, the court held:

> Given that Westboro's speech was at a public place on a matter of public concern,
> that speech is entitled to 'special protection' under the *First Amendment*.   Such
> speech cannot be restricted simply because it is upsetting or arouses contempt. '**If
> there is a bedrock principle underlying the *First Amendment*, it is that the
> government may not prohibit the expression of an idea simply because
> society finds the idea itself offensive or disagreeable**.'   *Texas v. Johnson, 491
> U.S. 397, 414, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989)*.   **Indeed, 'the point of
> all speech protection . . . is to shield just those choices of content that in
> someone's eyes are misguided, or even hurtful**.'   *Hurley v. Irish-American
> Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U.S. 557, 574, 115 S. Ct.
> 2338, 132 L. Ed. 2d 487 (1995)*.

*Id*., __, U.S. __, 131 S.Ct. at 1219 (emphasis added).

The court went on to hold that the church members' speech was fully protected even if it

were outrageous, because "'[In] public debate [we] must tolerate insulting, and even outrageous

speech in order to provide adequate 'breathing space' to the freedoms protected by the *First*

*Amendment*.'" *Id*., __, U.S. __, 131 S.Ct. at 1219, *quoting Boos v. Barry*, 485 U.S. 312, 322

(1988).

Mr. Snyder claimed the Westboro church members defiled the sacred moment of his

son's funeral.   In this case plaintiffs claim Public Advocate defiled a "beautiful moment."

Complaint ¶ 1.   Even if that were so, the First Amendment unconditionally precludes holding

Public Advocate liable for its core political speech:

> Speech is powerful. It can stir people to action, move them to tears of both joy
> and sorrow, and--as it did here--inflict great pain.   On the facts before us, **we
> cannot react to that pain by punishing the speaker**.   As a Nation we have
> chosen a different course--to protect even hurtful speech on public issues to
> ensure that we do not stifle public debate. That choice requires that we shield
> Westboro from tort liability for its picketing in this case.

*Id*., __, U.S. __, 131 S.Ct. at 1220 (emphasis added).

This case is strikingly similar to *Raymen v. U.S. Senior Assoc*., 409 F.Supp.2d 15 (D.D.C.

2006).   Like the photograph at issue here, *Raymen* involved a photograph of two men kissing at

a same-sex wedding.   The United States Senior Association, Inc. ("Association") used the

photograph as part of a campaign in opposition to public policy positions taken by the American

Association of Retired Persons.   Same-sex partners Steve Hansen and Richard Raymen sued the

Association under a number of theories, including invasion of privacy and misappropriation of

likeness.   The court granted the Association's motion to dismiss, holding:

> . . .   there is no actionable appropriation of a person's likeness claim 'when a
> person's picture is used to illustrate a noncommercial, newsworthy article.' *Id*.

This proscription is demanded by the *First Amendment*, which courts have concluded 'permits the use of a plaintiff's name or likeness when that use is made in the context of, and reasonably relates to, a publication concerning a matter that is newsworthy or of legitimate public concern.' *Joe Dickerson & Assocs., LLC v. Dittmar, 34 P. 3d 995, 1003 (Colo. 2001)* . . .

*Id.*, 409 F.Supp.2d at 23.

In this case Messrs. Edwards and Privitere posted the Photograph on the Internet to celebrate same-sex unions. The issue of homosexual relations generally and same-sex unions in particular are matters of public concern. Public Advocate used the Photograph to comment on a matter of public concern when it expressed its opposition to plaintiffs' position. Whether one agrees with Public Advocate's position or even finds it hurtful, repulsive and beyond the bounds of decency is beside the point. Indeed, as the court noted in *Snyder*, the First Amendment has its most important application in just such a case. Public Advocate's speech "occupies the highest rung of the hierarchy of First Amendment values," and therefore Public Advocate's use of the Photograph is protected core political speech and plaintiffs' misappropriation of likeness claim must fail under the First Amendment privilege set forth in *Joe Dickerson & Assocs., LLC v. Dittmar*, 34 P.3d 995, 997 (Colo. 2001).

### 3. The Mailers Relate to Matters of Public Concern

Plaintiffs have previously tried to deflect the Court's attention from the real issue at hand by seeking radically to narrow the scope of the "matter of public concern" about which Public Advocate was expressing its views. They cite *Joe Dickerson & Assocs., LLC v. Dittmar*, 34 P.3d 995, 1003 (Colo. 2001), for the proposition that the First Amendment privilege applies when the use of plaintiffs' likeness is made in the context of, and reasonably relates to, a matter of legitimate public concern. They then assert that the matter of public concern at issue here is

11

whether Jean White or Jeffrey Hare should have been elected. They then state that their Photograph has nothing to do with that issue.

It is obvious, however, that the issue of public concern implicated in this case is not as narrow as plaintiffs assert. The issue is whether same-sex unions should be recognized by law, and that is a matter of public concern. Indeed, the holding in *Snyder v. Phelps*, *supra*, rests on the proposition that homosexual relations generally and by implication same-sex unions in particular are matters of public concern.

In this regard, the passage in *Dittmar* immediately after the one quoted by plaintiffs is particularly germane. The court quoted *Haskell v. Stauffer Communications, Inc.*, 26 Kan. App. 2d 541, 990 P.2d 163, 166 (Kan. App. 1999), as follows: "If a communication is about a matter of public interest and there is a real relationship between the plaintiff and the subject matter of the publication, the matter is privileged." *Id*. The issue, therefore, is whether there is a real relationship between these plaintiffs and the subject matter of Public Advocate's speech. Plaintiffs Edwards and Privitere injected themselves into the same-sex union debate when they posted hundreds of photographs (including the one at issue in this case) celebrating such a union on the Internet. There is obviously a "real relationship" between plaintiffs' public celebration of same-sex unions and Public Advocate's publication in opposition to such unions. Finally, as noted above, the court in *Raymen v. U.S. Senior Assoc.*, 409 F.Supp.2d 15 (D.D.C. 2006) – citing *Joe Dickerson & Assocs., LLC* – rejected the argument plaintiffs are making here.

**4. Public Advocate Was Not Motivated by Commercial Concerns**

In *Joe Dickerson & Assocs., LLC*, the court noted that the First Amendment privilege might not apply if the likeness were used for commercial purposes:

12

In many situations, however, it is not altogether clear whether a particular use of a person's name or likeness is made for the purpose of communicating news or for the purpose of marketing a product or service. After all, many advertisements incorporate factual information as part of their sales message. . . . To resolve this question, courts must determine whether the character of the publication is primarily noncommercial, in which case the privilege will apply, or primarily commercial, in which case the privilege will not apply.

*Id.*, 34 P.3d 1003.

Importantly for purposes of this motion, the court held that this determination is ordinarily made by the court as a matter of law. *Id.* The court defined commercial speech as "speech that proposes a commercial transaction." *Id.*, 34 P.3d 1003.

Even a casual glance at the mailers reveals they are political advocacy pieces. Commercial considerations were non-existent. They do not even have a request for donations. Nor were any donations received as a result of the mailings. Delgaudio 126:6-18; 128:15-19. There cannot be the slightest doubt that the mailers were not commercial speech.

### 5. A General Profit Motive is Not A Factor

Plaintiffs have suggested that the mailers might be considered commercial speech if Public Advocate had been motivated by a general profit motive. As set forth above, Public Advocate clearly was not motivated by a profit motive. Even it had been, however, the Colorado Supreme Court considered and unambiguously rejected the precise argument plaintiffs have made:

A profit motive does not transform a publication regarding a legitimate matter of public concern into commercial speech. Many news publishers, including newspapers and magazines, are motivated by their desire to make a profit. . . . Similarly, the defendant's speech is protected even if he intends it to result in profit to him, so long as the contents of the speech qualify for protection.

*Joe Dickerson & Assocs., LLC*, 34 P.3d at 1004.

The New Jersey Supreme Court's decision in *G.D. v. Kenny*, 205 N.J. 275, 15 A.3d 300 (2011), is on all fours with this case.   There a public relations firm was engaging in an activity similar to Public Advocate's activity in this case, and it used the criminal history of a political candidate's aide in a campaign flyer.   The aide sued for misappropriation of likeness, but the court rejected the claim, stating:

> We also conclude that defendants did not commit the tort of misappropriation of G.D.'s name and image because the use of his name and image in the campaign flyers was not for a commercial purpose directly benefiting defendants.   **That the Shaftan defendants are in the business of public relations and marketing and prepared the campaign flyers does not make publication of the flyers a publication in the commercial sense**.   The campaign flyers represented political speech attacking the judgment of a candidate running for public office.   **This is the type of speech that is at the heart of First Amendment guarantees**.

*Id*., 15 A.3d 311-12 (citations omitted; emphasis added).

### 6.   The Privilege is Not Limited to News Reporting

Finally, plaintiffs have suggested that the First Amendment privilege is limited to news reporting.   Here again, the Colorado Supreme Court considered and rejected this very argument:

> **The fact that the defendant's article did not appear in a traditional newspaper does not change this result**.   We have previously stated that 'it is . . . well established that freedom of the press is not confined to newspapers or periodicals, but is a right of wide import and 'in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.'' *In re Hearings Concerning Canon 35 of the Canons of Judicial Ethics*, 132 Colo. 591, 593, 296 P.2d 465, 467 (1956) (*citing Lovell v. City of Griffin*, 303 U.S. 444, 452, 82 L. Ed. 949, 58 S. Ct. 666 (1938)).   This means that if the contents of an article are newsworthy when published by a local newspaper, then they do not cease to be newsworthy when subsequently communicated by a different sort of publisher.

*Joe Dickerson & Assocs., LLC*, 34 P.3d 995, 1004 (Colo. 2001) (emphasis added). *See also G.D. v. Kenny*, *supra* (First Amendment defense to misappropriation claim applied to political flyer).

**D.    Public Advocate's Use of the Image in the Mailers is Protected Fair Use and Does Not Constitute Copyright Infringement.**

Public Advocate incorporates the fair use arguments set forth in the NAGR

Memorandum.

## III.   CONCLUSION

Public Advocate is entitled to summary judgment because the mailers constituted core

political speech and were therefore protected by the First Amendment and Public Advocate's use

of the image was permitted as a proper fair use.

Dated:   November 14, 2013

*/s/ Barry K. Arrington*

_____
Barry K. Arrington
Arrington Law Firm
7340 East Caley Avenue, Suite 360
Centennial, Colorado   80111
E-Mail: barrry@arringtonpc.com
Phone: 303.205.7870
Fax: 303.463.0410

CERTIFICATE OF SERVICE

The undersigned certifies that on November 14, 2013 a true and correct copy of the foregoing was served via the Court's the CM/ECF system on:

Daniel D. Williams, Esq.
Christopher L. Larson, Esq.
Kathryn A. Feiereisel, Esq.
Faegre Baker Daniels LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, Colorado   80203-4532

Samuel Wolfe, Esq.
Anjali J. Nair
Southern Poverty Law Center

400 Washington Avenue
Montgomery, Alabama   36104

Daralyn J. Durie, Esq.
Joseph C. Gratz, Esq.
Durie Tangri LLP
217 Leidesdorff Street
San Francisco, California   94111

Terrance L. Ryan, Esq.
The Terry Ryan Law Firm, LLC
800 Marshall Street
Fort Collins, Colorado   80525

Laurin H. Mills, Esq.
LeClairRyan, PC-Alexandria
2318 Mill Road
Suite 1100
Alexandria, Virginia   22314

*/s/ Barry K. Arrington*

_____

Barry K. Arrington