```
1

2              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
3
       - - - - - - - - - - - - - - x
4    KRISTINA HILL,                  :
     BRIAN EDWARDS, and              :
5    THOMAS PRIVITERE,               :
                                     :
6                 Plaintiffs,        :  Civil Action No.
                                     :  1:12-cv-02550-WYD-KMT
7           v.                       :
                                     :
8    PUBLIC ADVOCATE OF THE          :
     UNITED STATES,                  :
9                                    :
                  Defendant.         :
10                                   :
       - - - - - - - - - - - - - - x
11                              Monday, March 18, 2013

12                              Manassas, Virginia

13   Deposition of

14                    EUGENE DELGAUDIO

15   a witness, called for examination by counsel for the

16   plaintiffs, pursuant to notice, held at the offices of

17   Vanderpool, Frostick & Nishanian, P.C., 9200 Church

18   Street, Suite 400, Manassas, Virginia, beginning at

19   10:25 a.m., before Frances M. Freeman, a Notary Public

20   in and for the Commonwealth of Virginia, when were

21   present on behalf of the respective parties:
```

```
1    Subjects of Deposition, there are 20 subjects.

2         A    Yes.

3         Q    Have you been designated by Public Advocate

4    to testify about all 20 of these subjects?

5         A    As president of Public Advocate, I have

6    authority to represent the organization.

7         Q    Thank you.  Are you able to testify about all

8    20 of these subjects?

9         A    Yes.

10        Q    And so you understand that in your Deposition

11   here today that the answers that you give will be the

12   official answers of Public Advocate as defendant in

13   this case?

14        A    Yes.

15        Q    And you are the designated agent to testify

16   about all 20 of these subjects on behalf of Public

17   Advocate?

18             MR. COLLINS:  Objection.  Asked and answered.

19   You can answer.

20             THE WITNESS:  Except Number 14.

21             BY MS. SUN:
```

```
 1       A    It's a pro-family group publicizing

 2   hypocrisy, exposing contradictions, statements made in

 3   Washington by elected officials and by regulatory

 4   agencies and by presidential administrations as

 5   opposed to their impact or their actual lack of

 6   consistency.

 7            That's why Public Advocate was founded.

 8       Q    Are there particular issues that Public

 9   Advocate focuses on, social issues, public policy

10   issues?

11       A    Historically, Public Advocate has been

12   involved in limited government excessive taxes,

13   excessive regulations, overreaching federal decisions,

14   whether it's in Congress or in the Courts.

15   Referendums have always been important to the group.

16            That's it.

17       Q    What about with respect to homosexual rights?

18       A    In 1981, I was asked to put a focus on what I

19   thought as president of Public Advocate would be a

20   subject that would require public advocate.

21       Q    And so you chose homosexual rights?
```

1           MR. COLLINS:   No foundation.   Unclear.   It's

2    a statement of -- the question has been asked and

3    answered already, counselor.   You've asked about the

4    mission statement.   You've already asked about the

5    nature of their support for Public Advocate and the

6    definition of traditional and nontraditional rights.

7           BY MS. SUN:

8      Q    Please answer the question.

9      A    Can you ask it again?

10     Q    Sure.

11          MS. SUN:   Could the court reporter please

12   read back the question?

13          (Thereupon, the reporter read the record as

14   requested.)

15          MR. COLLINS:   Objection for the record.

16          You may answer if you wish.

17          THE WITNESS:   Yes.

18          BY MS. SUN:

19     Q    How so?

20          MR. COLLINS:   Objection.

21          THE WITNESS:   Public Advocate is seeking to

1    preserve the family in a traditional manner.  To the

2    degree that vices are embraced by public policy,

3    Public Advocate would raise an objection.

4           BY MS. SUN:

5      Q    How does being in a gay family not fit the

6    definition of family in the traditional manner?

7           MR. COLLINS:  Objection, counselor.  You are

8    going beyond the scope of your own Notice of

9    Deposition.  Please indicate in Topic 1 or anywhere in

10   this notice where questions about homosexual families

11   or people engaging in homosexual activities are

12   covered by this notice.

13          MS. SUN:  I'm just asking about Public

14   Advocate's mission.

15          MR. COLLINS:  No.  You didn't designate it as

16   a topic in this case.  You asked about its mission.

17          MS. SUN:  Yes.

18          MR. COLLINS:  The witness has testified about

19   its mission.

20          MS. SUN:  I'm allowed to ask follow-up

21   questions.  And if you want to have the Magistrate

1  stop this line of questioning, you're free to do that.

2  But unless you're instructing him not to answer, let's

3  move on with the Deposition.

4          MR. COLLINS:  I'll let you ask one more

5  question, then I'll call the Magistrate.  This is

6  getting out of hand.

7          MS. SUN:  Okay.

8          MR. COLLINS: You can answer this question.

9          THE WITNESS:  Could you ask the court

10  reporter to ask --

11          MS. SUN:  Yes, I will.  I'm sorry.

12          I have lost track of it, too.

13          (Thereupon, the reporter read the record as

14  requested.)

15          THE WITNESS:  Public Advocate has a

16  preference for a man-woman marriage in public policy,

17  federal, state and local.

18          Public Advocate has been unique, strident,

19  upfront and loud about that preference.  And in

20  furthering the preference of a man-woman marriage, it

21  has been aggressive nontraditional and has been

```
1              I think that's a good start.

2        Q    Does Public Advocate also oppose civil

3    unions, domestic partnerships, other types of legal

4    protections for gay couples?

5              MR. COLLINS:  Objection.  Foundation.  Is it

6    part of its mission?

7              MS. SUN:  Yes.

8              THE WITNESS:  Public Advocate has

9    strategically commented on many aspects of the

10   foundation of traditional families to include comments

11   on that.

12             BY MS. SUN:

13       Q    Thank you.  I appreciate that.

14             My question was whether it was part of Public

15   Advocate's mission to oppose civil unions, domestic

16   partnerships or other types of legal protections for

17   gay couples?

18       A    If we could take them one at a time.

19       Q    Sure.

20       A    Civil union, yes.  What was the other?

21       Q    Domestic partnerships.
```

```
1    artwork.  So he suggested I speak with Lucius.

2         Q    And who is the Dudley you're referring to?

3         A    Dudley Brown.

4         Q    So when you refer to Dudley, you mean --

5         A    Dudley Brown.  I spoke to Dudley Brown.  And

6    Dudley Brown suggested Lucius.  And I spoke to Lucius

7    and described to him what I wanted.

8         Q    Maybe this will refresh your recollection.

9    Is Lucius' last name O'Dell?

10        A    I could not remember.

11        Q    Okay.  Whose idea was it to send mailers in

12   these Colorado state races?

13        A    My group is small, so we have to be careful

14   about what races we get into when we are presenting

15   opinions or presenting contrast.

16             And the contrast has to be black and white.

17   It has to be for marriage or against marriage.  And so

18   Colorado was one of those states where there was a

19   vote in the legislature.

20             And in the case of New Hampshire, we would --

21   I would call every voter in districts, and that would
```

1    be a cheap way, inexpensive way to reach a lot of

2    people.

3              In Colorado, it was so close, one vote

4    margin.  The contrast between New Hampshire, it's a

5    small population with a lot of representatives, so

6    phoning would make sense there.

7              In Colorado, it would seem postcard mailer

8    during an election cycle for a low turnout primary

9    would be more effective.  I made the decision.

10             Did I answer your question?

11        Q   I believe so.

12        A   I think you were asking postcard, Colorado,

13   who did that.  And I think I have explained that.

14        Q   Okay.  Thank you.

15             So we were talking about Lucius and his

16   volunteer work for you.

17        A   Yes.

18        Q   I'm sorry.  And how were you put in touch

19   with Lucius?

20        A   Dudley Brown.

21        Q   Do you know how Lucius selected the

```
1    question.  It's impossible to answer that.

2              BY MS. SUN:

3        Q    Okay.  Since you don't know who he is, he is

4    not a public figure in your mind?

5        A    I would not make a judgment as to whether or

6    not he's a public figure, as I have done no research

7    on the gentleman until you just presented his name

8    here.

9        Q    How about Tom Privitere, do you have any idea

10   who he is?

11       A    No, I do not.

12       Q    Do you know if Brian Edwards and Tom

13   Privitere are the same sex couple in the mailers?

14       A    I could not identify them.

15       Q    So at the time when you saw the artwork for

16   the mailers before they were sent out, did you have

17   any idea who the same sex couple was in the photo?

18       A    No.

19       Q    Did you have final approval over the mailers

20   before they were sent out?

21       A    Yes.
```

```
1              So the Number 1 question is, Who is putting

2    this out.  And it's for an authority to verify that

3    there is a public policy group that's putting this out

4    and that -- the name of it and so on where they can go

5    for background on the organization.  Yes.

6         Q    Did you hope that at least some of those

7    folks who received the mailer would approve of the

8    mailer and perhaps even give a donation to Public

9    Advocate?

10        A    We would hope -- those are two questions.

11   The first one is we would want them -- we would think

12   that the generic public agrees with us on this issue,

13   on -- against same sex marriage.

14              And Number 2, these mailings were never meant

15   as fundraisers or my robo calls, for that matter,

16   anything related to our outreach on contrast between

17   same sex marriage and traditional marriage.

18              They're just -- they're just outreach.

19        Q    Do you ever send fundraising appeals

20   explaining that Public Advocate needs funds in order

21   to print publications and send materials to the voting
```

1    impression.  And you pay for that.  And we don't have

2    time to ask for money.

3         Q    Right.  I'm not asking about this particular

4    postcard and whether it was directly asking for money.

5    I'm simply asking:  Does Public Advocate send out

6    fundraising appeals requesting donations in order to

7    send out these types of postcards?

8              MR. COLLINS:  Asked and answered.  Objection.

9              THE WITNESS:  And I said yes.  But we never

10   make reference to a particular campaign.

11             BY MS. SUN:

12        Q    Okay.  Thank you.

13        A    -- or state.  I mean, it's 50 states.  So

14   it's pretty wide.

15        Q    Do you know if you received any donations

16   directly because of these postcards that you mailed

17   out?

18        A    Yes.  I received no donations as a result of

19   this.

20        Q    How do you know that?

21        A    I monitor the donations on a regular basis,

1      Q    I'll just represent to you that it was

2    produced on behalf of Public Advocate in response to a

3    documents request that plaintiffs made.  So,

4    presumably, it's from your e-mail account.  But if

5    there is any reason for you to believe that it isn't,

6    please, let me know.

7      A    I don't -- you know, mostly, it's, you know,

8    getting the proposal.  Because if someone represents

9    something to me, I need to know what this is about.

10          And in order to find out what this is about,

11   I'm saying I'm willing to approve and fund it as

12   outlined.  It's just -- I am willing to look at

13   anything.

14          People write me and say, Would you consider

15   this.  I consider everything.

16     Q    Sure.  So you were stating that you were

17   willing to approve and fund it as outlined in Mike and

18   Dudley's memo?

19     A    Yes.

20     Q    Do you recall what Mike and Dudley's memo

21   was?

1       A    Well, this is the Mike and Dudley memo that

2    you have shown to me today, but I only recall it as a

3    phone call.  I only recall it being, you know, I want

4    to do something in Colorado.  And I called Mike, and

5    Mike gave me Dudley's number.

6       Q    So the memo --

7       A    I think my position is that people suggest

8    things to me all the time.  And independent of them, I

9    have to believe that it's important.

10      Q    Right.

11      A    And so they may suggest things.  They may

12   believe they are suggesting things to me, but I have

13   to really independently verify this.  Is it important

14   for Public Advocate to be in Colorado and does it suit

15   Public Advocate -- independently of the suggestion.

16      Q    Absolutely.  I completely understand that.

17   Just to be clear, so the memo that's referred to in

18   Exhibit 9, it's your testimony that it's the memo

19   that's stated in Exhibit 8?

20      A    Yes.

21      Q    Or included in Exhibit 8?

```
1    much money would be required for postage, which is

2    pretty much what I wrote a check for, $1,700.

3         Q    So it was an e-mail from Mr. O'Dell to you?

4         A    Yes, subject to verification with the mail

5    house.  This is what he was representing to me.

6         Q    So when earlier we were discussing how many

7    households received the mailers, you said a few

8    thousand, do you see in the e-mail where Mr. O'Dell

9    refers to Republican primary voters who have voted in

10   two or three of the last three primary elections and

11   newly registered voters?

12        And for the first number he gives is 4,625

13   for House District 48?  Do you see where I'm referring

14   to?

15        A    Yes.  Yes, I do.

16        Q    Does that refresh your recollection about the

17   number of households that received mailers?

18        A    A few thousand.  This is -- yes.

19        Q    And so the next line down about Senate

20   District 08 where the number is 5,006, that's your

21   understanding of how many households received the
```

1    mailers in that district?

2        A    I think so.  I'm pretty sure that would be

3    right.  Approximately 10,000, give or take a few, 500

4    or something.  And that would make it $1,700 for

5    postage.

6            (Thereupon, Deposition Exhibit No. 16 was

7    marked for identification.)

8            BY MS. SUN:

9        Q    I'm going to show you what has been marked as

10   Exhibit 16.

11       A    Yes.

12       Q    Do you recognize Exhibit 16?

13       A    Yes.

14       Q    What is it?

15       A    A confirmation that I was going to write a

16   check for $1,700 and send it to the mail house.  But I

17   needed to be told where the mail house was and exactly

18   who to mail the check to.  And I needed to be told

19   that so that I could get somebody else to write the

20   check so that they could make sure that that's right.

21       Q    Earlier we were discussing your conversations

```
 1    can mail 100,000 people and you are going to get

 2    nothing, or you can mail 10 people and every one of

 3    them call you.  It's never --

 4         Q    Unpredictable?

 5         A    Unpredictable.

 6         Q    So was there any particular reason that you

 7    shared this reaction with Mr. Rothfeld?

 8         A    In my head 10,000 people, one contact.

 9         Q    Right.  I mean, you could have shared that

10    reaction with your neighbor or the grocery store

11    clerk.  I'm asking why you shared this information

12    with Mr. Rothfeld.

13         A    This is the final result of something that

14    started a long time ago, kind of like, Wow, great

15    idea, Mike.  One comment.  Great work.

16         Q    Do you know if Senators -- or let me start

17    over.  Was Senator White and Mr. Hare, were they

18    defeated in their primary races?

19         A    Yes.

20         Q    Do you believe that your mailers had any role

21    in their defeat?
```

```
1    clients.  And there was none of that here.

2           It was more of a blog.  More of a generic

3    advocacy, you know, from a genuinely, sincerely-felt

4    belief that this is the way things should be, and

5    passively looking for clients or passively looking for

6    inquiries as opposed to -- and there seemed to be a

7    lot of photographs there.

8           So I, you know -- that was my impression.

9    That it was just a passive blog where the use of

10   photographs was clearly -- I got the impression this

11   group was using other people's photographs to explain

12   what they do.

13          BY MS. SUN:

14     Q    What other photographs of people did you see?

15     A    There was hundreds of photographs of

16   marriages and galleries.  So I didn't get the

17   impression that this was a photographer as much as it

18   was a review of various photography of gay couples.

19   So it looked like a collection point for upscale

20   promotion of gay marriage.

21     Q    Okay.  Earlier we were talking about Mr.
```

1    O'Dell's representations about the photo being from a

2    publicly-available source.  So when you looked at the

3    website, did that confirm that the photo was, in fact,

4    from the publicly-available source according to your

5    criteria?

6        A    It wasn't the publicly-available source I had

7    in mind.

8        Q    Okay --

9        A    I was looking for Colorado for Equality.  I

10   was looking for the Human Rights Campaign Fund.  I was

11   looking for National Gay Rights or even National

12   Organization On Women.  I mean, I was looking for some

13   logo that was political in nature.

14            There was advocacy here, but not in a

15   strident, political nature.

16       Q    And that makes a difference why?

17       A    Because they're using -- it's explicit.  When

18   a political advocacy group is taking photographs, it's

19   for the purpose of publicity.  When they are posting

20   it on their websites, it is for the purposes of public

21   policy, influencing public policy.

1    didn't seem to be at this website a person or an

2    individual. Sometimes a commercial artist will put

3    their name in big bold letters. This was a generic

4    gay wedding experience.

5              It seemed to be advocacy of a soft, generic,

6    all-encompassing, environmental nature. Just a

7    different form. Not political advocacy in the hard

8    sense of making a decision now, but simply soft

9    advocacy in the sense of atmospheric situational:

10   This is everything, this is everything that we need to

11   be, and this is how you want your celebration to be.

12             And in that sense, that was the political

13   content of the website.

14   Q    Okay. So because they were expressing the

15   view that they had gotten engaged and they desired to

16   be married, that, in your mind, is a political

17   statement?

18   A    There was hundreds of photographs at this

19   website.

20   Q    I'm just asking about that --

21   A    And the variety and the presentation was not,

1    available.  Blogs put out stuff.  Websites put out

2    stuff.  A variety of commercially free, copyright free

3    photographs are available.

4           Conservative groups do the same thing.  They

5    go to rallies and they take photographs.  And these

6    are pictures that would be available at wire services

7    and news services.  And clearly, this is not a hard

8    political site.

9           BY MS. SUN:

10   Q    Okay.  So the answer is, Yes, you would have

11   asked that a different photo be used, because this

12   photo was not from a hard political advocacy website?

13          MR. COLLINS:  Objection to form.

14          BY MS. SUN:

15   Q    I completely understand the distinction

16   between passive and hard and --

17   A    Yeah.  I think -- I think that -- I wasn't

18   married to this photograph.  I wasn't sold on this

19   photograph.  I was told it was a photograph from

20   Colorado and the trees or whatever.

21          And so I would not have used this photograph

```
1    if I had seen this website.

2         Q    Based on your review of the website on June

3    28th, 2012, when you received the information from

4    Dudley Brown, do you believe that Mr. O'Dell's

5    representation that the photo came from a

6    publicly-available site is accurate?

7              MR. COLLINS:   Objection to the extent it

8    calls for legal conclusions.   Factual answers are

9    appropriate.

10             THE WITNESS:   My understanding is advocacy is

11   advocacy.   Just because I have a higher standard of

12   what advocacy is and I have a discernment that there

13   are people in the front lines and there are people

14   that are just along for the ride, I make that

15   discernment, and so that is simply a discernment based

16   on experience.

17             I'm interested in people who are on the front

18   lines.   I want a front-line photograph.   If someone is

19   in Colorado kissing in front of trees and posting that

20   in Colorado, yeah, I definitely think that's

21   appropriate.
```

1        And so in this case, they are not in

2   Colorado.  And they are not with -- you know, they are

3   in Manhattan.  So I felt kind of -- this is a

4   political site.  Advocacy, soft advocacy, but it's not

5   the hard standard that I would have wanted.

6        BY MS. SUN:

7        Q   Right.  In fact, if folks knew or recipients

8   of the mailers knew that the couple weren't even from

9   Colorado and they were from New York City, that would

10  have detracted from the message of the mailer.

11  Correct?

12       A   Yes.  That is correct.  Yes.

13       Q   And so by Public Advocate's standards, the

14  photo did not, in fact, come from a publicly-available

15  source?

16       MR. COLLINS:  Objection.  That is not the

17  testimony that's been given so far.

18       MS. SUN:  Okay.  If it's not, I am confused

19  because --

20       MR. COLLINS:   If you want to ask the

21  question --

1           THE WITNESS:  Soft political.  It's still

2    soft political, soft advocacy.  This was clearly a

3    site devoted to one side of the issue exclusively in

4    words and in advocacy and statements and policies and

5    wishes and designs and all-encompassing environment,

6    the future, multitude of examples.

7           I would say it was probably the most generous

8    wedding site of its kind available.  I think that was

9    what they were looking for.

10          Now, gay wedding experience.  They did a good

11   job of presenting a multitude of photographs for that

12   purpose, to convey, mainstream same sex weddings as

13   the norm.

14          And I don't think there is any similar

15   website on the other side of it for traditional

16   marriage.  I don't think it exists.  This actually was

17   a pretty good advocacy website -- for the blog.  It's

18   a blog.  But it was a concept.  And I understood the

19   concept upon immediately seeing it.

20          BY MS. SUN:

21      Q   So it made a difference to you that there

```
1            You can answer.

2            THE WITNESS:  And I don't know where he got

3    the photograph until now, meaning, you know, after the

4    fact.  My standard is different from his standard, but

5    I don't know how he arrived at his standard.

6            BY MS. SUN:

7        Q   I'm just talking about your standard.  And I

8    don't mean to be or to make this more difficult than

9    it is.

10           We were talking in the morning about his

11   representations to you about the photo being okay to

12   use and that the photo was from a publicly-available

13   source.  And you and I had a exchange about your

14   definition of publicly-available source.

15           And so I'm asking you:  Sitting here today,

16   having looked at the website, is it the position of

17   Public Advocate that Mr. O'Dell accurately represented

18   to you that the photo was from a publicly-available

19   source, according to your definition?

20       A   Yes.

21       Q   If we could go back to Exhibit 22, which is
```